**PLEASANTVIEW CONVALESCENT AND NURSING CENTER, INC.,**
Plaintiff-Appellant,

v.

**Caspar W. WEINBERGER, as Secretary of Health, Education and Welfare of the United States, and Aetna Life and Casualty Company, Defendants-Appellees.**

No. 75–1562.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 20, 1976.
Decided March 31, 1976.*

---

\* This appeal was originally decided by unreported order on March 31, 1976. See Circuit Rule

35. The court has subsequently decided to issue the decision as an opinion.

Richard C. Bollow, Chicago, Ill., for plaintiff-appellant.

Samuel K. Skinner, U. S. Atty., Anne Bowen Poulin, Asst. U. S. Atty., Chicago, Ill., for defendants-appellees.

Before HASTINGS, Senior Circuit Judge, and CUMMINGS and BAUER, Circuit Judges.

HASTINGS, Senior Circuit Judge.

Pleasantview Convalescent and Nursing Center is a skilled nursing home in Niles, Illinois. Since 1968 it has provided nursing care for Medicare patients pursuant to agreement with the Secretary of Health, Education and Welfare and the provisions of Title XVIII of the Social Security Act, 42 U.S.C. § 1395. Defendant Aetna Life and Casualty Company, as designated fiscal intermediary under 42 U.S.C. § 1395h, is responsible for determining the amount of payments to be made to Pleasantview as a Medicare provider. Pleasantview brought the instant action seeking full reimbursement for costs which it incurred in the care of Medicare patients in 1971. After a hearing, Aetna's initial determination to disallow a portion of those costs was affirmed by a Provider Appeals Officer.[1] The district court agreed with the hearing officer and granted summary judgment in favor of the Secretary and Aetna. We affirm.

---

1. Administrative review of provider reimbursement decisions was governed at that time by regulations which provided for a hearing before a hearing officer appointed by the fiscal intermediary. 20 C.F.R. § 405.490 *et seq.* These procedures are now replaced by statutory provisions establishing a Provider Reimbursement Review Board. 42 U.S.C. § 1395oo.

Aetna's audit of Pleasantview's 1971 expenditures established that Pleasantview had spent $102.53 per patient day in caring for Medicare patients. Aetna examiners determined that each expense had been actually incurred and that the amount expended for each single item of account had not been unreasonably high. However, in the aggregate, Pleasantview's per patient day costs were more than five times the average cost of $19.59 incurred by comparable facilities in the same geographic area.

The record developed before the hearing officer and before the district court indicates that Pleasantview's high per patient day costs in 1971 resulted from two factors: (1) the expense which unavoidably flowed from its decision to operate with two Medicare certified distinct parts,[2] rather than one; and (2) the low rate of occupancy in its two distinct parts which resulted from its failure to reduce the number of certified beds during a three-year period of declining occupancy.[3]

Pleasantview apparently chose to operate two Medicare certified distinct parts in order to preserve its practice of segregating senile and nonsenile patients in the Medicare as well as in the private patient sections of its facility. This segregation was intended to enhance the institutional environment and speed patient recovery. The high cost of Pleasantview's distinct part operation was principally due to an Illinois law which required it to maintain separate nursing staffs for each distinct part in addition to the staffs serving the remainder of its facility. As for Pleasantview's failure to reduce the number of certified beds, this initially resulted from its apparent inability to predict occupancy levels prior to 1971; after January 1, 1971, any reduction was precluded by Medicare regulations prohibiting providers from changing their number of certified beds except at the beginning of an accounting year.

Because of the substantial discrepancy between Pleasantview's per patient day costs and those of institutions found to be comparable, Aetna concluded that Pleasantview's total costs were not "reasonable" within the meaning of the then existing statute, 42 U.S.C. § 1395f(b) and 1395x(v), and were therefore not fully reimbursable under the Medicare Act.[4] Pleasantview's reimbursement was consequently limited to a rate of $69.78 per patient day.[5] As a result, Pleasantview claims that it was not reimbursed for some $58,000 which it actually expended on Medicare patient care in 1971.

Under the then applicable language of 42 U.S.C. § 1395f(b), "[t]he amount paid to any provider of services with respect to services for which payment may be made under this part shall * * * be the reasonable cost of such services." According to section 1395x(v), "reasonable cost" is to be deter-

---

**2.** Pleasantview certified a nine bed section of the first floor of its facility as a distinct part. A second distinct part consisting of 25 beds was set aside on the second floor. Each distinct part was certified to provide the higher level of nursing care for which Medicare benefits are available. The Bureau of Health Insurance and Aetna both recommended that Pleasantview limit its certification to a distinct part instead of certifying its entire facility. This insures that, in determining the rate of reimbursement, the higher cost of care for Medicare patients is averaged only among patients occupying the distinct part and actually receiving the higher level of care.

**3.** Pleasantview's distinct parts were 57.1% occupied in 1969, 35.1% occupied in 1970, and 16.2% occupied in 1971. Comparable facilities averaged an 80% rate of distinct part occupancy in 1971.

**4.** Aetna also invoked the "prudent buyer concept," as outlined in the Bureau of Health Insurance, *Provider Reimbursement Manual* (HIM–15) (Chapter 21, Section 2103), to support its decision, but this rationale was rejected by the hearing officer and is not now urged on appeal.

**5.** According to Aetna, this figure provided full reimbursement for the cost of extra nursing staffs required by Illinois law. In addition, the final computation assumed a 50% occupancy rate rather than the 80% average occupancy of other facilities. This was intended to compensate for that degree of low occupancy attributable to cutbacks in Medicare benefits instituted after Pleasantview's distinct parts were certified.

mined in accordance with regulations promulgated by the Secretary. The applicable regulation provides in relevant part: "The provision in Title XVIII of the Act for payment of reasonable cost of services is intended to meet the *actual costs*, however widely they may vary from one institution to another. This is subject to a limitation where a particular institution's costs are found to be *substantially out of line* with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors." (Emphasis added.) 20 C.F.R. § 405.451(c)(2).

■ The hearing officer concluded that the costs incurred by Pleasantview were indeed "substantially out of line," within the meaning of the regulation, with those of other skilled nursing facilities with which they were compared. Under the limited scope of our review of administrative determinations, we may overturn this decision only if we are persuaded that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that it is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) and (E).[6] We note that the regulation here in issue requires the administrators of the Medicare program to draw a fine line between those costs which are within the wide variation permitted and those so out of line with average costs that they will not be reimbursed. In view of the nature of this determination, we conclude that the hearing officer did not abuse his discretion in finding that per patient day costs five times above the average are not intended to be fully reimbursed under the Act.

The hearing officer further found that principles of fairness would not be violated by limiting reimbursement in this case since Pleasantview's excessive per patient day costs were ultimately within its control. While separate nursing staffs were required by state law, Pleasantview could have avoided this extra cost by eliminating one of its distinct parts. Elimination of one distinct part or reduction of the number of certified beds in each distinct part would also have increased the occupancy rate. Moreover, the decisions below indicate that the costs incident to the two distinct part system were ultimately reimbursed. It appears that the final unreimbursed costs are attributable more to Pleasantview's failure to reduce the number of certified beds than to its decision to operate with two distinct parts. (*See* note 5, *supra*.) As the district court correctly observed in reviewing the hearing officer's decision, the fact that Pleasantview could not change its certification after January 1, 1971, did not excuse its failure to make the necessary reduction in certified beds prior to that time in view of its apparent escalating costs and declining occupancy rate.

■ We find unpersuasive Pleasantview's contention that, since no other area nursing home operated with two distinct parts, Pleasantview's costs should not be compared with those of other facilities. Pleasantview's decision to operate with two distinct parts should not prevent the general comparison with other providers which the regulations on reasonableness require. Otherwise, such a decision could effectively insulate a provider from accountability for its resulting costs. After thorough consideration of the relevant testimony and exhibits, the hearing officer determined that the nursing homes with which Pleasantview was compared were in fact similar in size, scope of services, location and utilization. We cannot say that this determination is unsupported by the evidence or contrary to the applicable regulations.

**6.** Although at the time of the initial determination there was no provision in the Medicare Act for judicial review of provider reimbursement determinations, the Second Circuit has held that jurisdiction nevertheless lies to review adverse determinations under the Administrative Procedure Act's provisions for nonstatutory review and under general federal question jurisdiction, 28 U.S.C. § 1331. *Kingsbrook Jewish*

*Medical Center v. Richardson*, 2 Cir., 486 F.2d 663 (1973); *Aquavella v. Richardson*, 2 Cir., 437 F.2d 397 (1971). The statute since has been amended to expressly provide for judicial review under the Administrative Procedure Act. 42 U.S.C. § 1395oo (f) (effective for accounting periods ending on or after June 30, 1973).

■ Pleasantview further contends that the decisions of the hearing officer and of the district court impermissibly intrude upon matters of medical judgment in violation of 42 U.S.C. § 1395. We agree that neither the Secretary, the fiscal intermediary, nor the courts may dictate to a nursing home the manner in which it must provide medical care for its patients. However, by setting some limits on provider reimbursement, the Act requires providers in the exercise of their medical judgment to observe a modicum of cost consciousness. Although we may acknowledge Pleasantview's medical justification for operating its facility with two distinct parts, we are not persuaded that the Secretary must reimburse the provider for all costs, no matter how extreme, which are incurred as a result of that medical decision. Moreover, the low occupancy rate, which was principally responsible for those costs not ultimately reimbursed, was more a factor of business judgment than of medical judgment.

■ We conclude that the district court did not err in finding that the decision of the hearing officer was neither arbitrary, capricious, nor an abuse of discretion and that it was supported by substantial evidence of record. As there were no issues of material fact in dispute, the court properly entered summary judgment for the defendants under Rule 56, Federal Rules of Civil Procedure, 28 U.S.C.

The judgment of the district court is affirmed. The clerk of this court will enter an appropriate order of affirmance.

AFFIRMED.

BAUER, Circuit Judge, dissenting.

I respectfully dissent. The majority's conclusion is that the high costs incurred by plaintiff resulted from Pleasantview's failure to reduce the number of certified beds in view of its apparent escalating costs and declining occupancy rate. Thus, this Court is affirming the district court's opinion that the plaintiff simply made a bad business judgment.

This is a review made from the position of hindsight. The case in its proper perspective, in my opinion, shows that plaintiff's decision was not freely made; rather, it simply sought to conform to the regulations promulgated by the various governmental agencies involved.

In many respects plaintiff got caught in a bureaucratic trap. Many, if not all, of the factors that led to excessive per patient costs were due to conditions beyond the control of the plaintiff.

Plaintiff sought certification of certain distinct parts of its institution pursuant to directions provided in a Health, Education and Welfare bulletin. Health, Education and Welfare subsequently certified "distinct parts" of plaintiff's institution. A major reason for the "distinct parts" was plaintiff's judgment that senile persons ought not be placed with non-senile persons as a matter of medical and psychological concern.

In 1971 occupancy levels in the distinct parts were quite low. This was caused, at least in part, by the fact that Medicare extended care facility benefits suffered a cut back so that it was difficult, if not impossible, for the plaintiff to get Medicare patients. The majority opinion attaches little importance to the fact that it was conduct on the part of the Government, a named defendant in this suit, which made the business decision to operate distinct parts such a bad course to follow.

Another factor beyond the control of plaintiff was a requirement of the State of Illinois that mandated separate nursing staffs for each distinct part. This requirement substantially increased the per patient, per bed costs incurred by the plaintiff. Yet it is undisputed that no given item of cost (including the double nursing salaries) incurred by plaintiff was unreasonable. This appeal is not an attempt to recover outrageous profits. The parties agree that plaintiff actually incurred the costs in question, that the costs were reasonable per se, and that plaintiff still would not make a profit if reimbursed for actual costs incurred.

The majority also gives no consideration to the fact that there was no warning given

to plaintiff that its decision to operate "distinct parts" might be a bad business decision. Health, Education and Welfare *recommended* that plaintiff operate its institution in such a fashion. Plaintiff was lulled by the repeated interim payments made on the basis of periodic cost reports. Pleasantview was never advised that there might be some dispute over its figures.

In summary, I must agree with plaintiff's assertion that, having operated its facility under the direction of the defendants to designate distinct parts, it became the victim of government actions. The Court seems willing to accept the defendant's view that after all the costs were in the plaintiff should not be reimbursed because the costs were not reasonable when compared to costs incurred by similar institutions. I believe such a position is inherently unfair to plaintiff in light of the facts that defendants gave them no indication that their costs would not be reimbursed, the factors that led to high costs were not within plaintiff's control, and the decision to operate distinct parts was based on medical judgment and pursuant to Health, Education and Welfare's recommendations. I would reverse the trial court's grant of summary judgment.