**MEDICAL CENTER HOSPITAL,**
**Plaintiff–Appellee,**

v.

**Otis R. BOWEN, Secretary of Health & Human Services, Defendant–Appellant.**

**No. 86–3662.**

United States Court of Appeals, Eleventh Circuit.

March 17, 1988.

Before TJOFLAT and ANDERSON, Circuit Judges, and MOORE\*, District Judge.

TJOFLAT, Circuit Judge:

In this case, a hospital participating in the Medicare program seeks review of its reimbursement claim for the fiscal year ending June 30, 1982. The hospital's claim had been denied to the extent it exceeded cost limits established by the Department of Health and Human Services (HHS). In the district court, the hospital argued that the cost limits had been applied on a conclusive basis in violation of 42 U.S.C. § 1395x(v)(1)(A)(ii) (1982).[1] The district court agreed, and ordered the Secretary of HHS to afford the hospital the opportunity to prove that its claimed costs in excess of the cost limits were reasonably incurred and therefore reimbursable under 42 U.S.C. § 1395x(v)(1)(A) (1982).

We divide our discussion into three parts. In Part I, we detail the development of the Medicare reimbursement scheme to the extent pertinent to the arguments raised on appeal. In Part II, we present the facts of this case. In Part III, we analyze the Secretary's arguments and conclude that the district court properly rejected those arguments and remanded the case for a determination of reasonable costs.

I.

In 1965, Congress enacted legislation creating a health care subsidization program for the aged and disabled, commonly known as the Medicare program. Social Security Amendments of 1965, Pub.L. No. 89–97, 79 Stat. 286 (codified as amended at 42 U.S.C. §§ 1395–1395zz). Under Part A of the Medicare program, qualified hospitals (providers) receive reimbursement for services provided to Medicare beneficiaries. Although providers may receive reimbursement directly from the Secretary, they commonly elect to proceed through "fiscal intermediaries," as authorized by 42 U.S.C.

Peter Loewenberg, Asst. U.S. Atty., Tampa, Fla., Robert L. Bergstrom, Dept. of HHS, Office of the General Counsel, Baltimore, Md., Anthony J. Steinmeyer, Jay S. Bybee, U.S. Dept. of Justice, Civil Div., Appellate Staff, Washington, D.C., for defendant-appellant.

Leonard C. Homer, Carel T. Hedlund, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for plaintiff-appellee.

---

\* Honorable John H. Moore, II, U.S. District Judge for the Middle District of Florida, sitting by designation.

1. Several of the statutory provisions cited in this opinion have been amended. Our citations refer the reader to the version of the statute applicable to the cost year involved in this case.

§ 1395h (1982). The provider appoints the intermediary, usually a private insurance company, and the intermediary enters into a contract with the Secretary whereby it agrees to discharge certain functions as the Secretary's agent. *Id.* § 1395h(a). As the Secretary's agent, the intermediary reviews the provider's claim for reimbursement, which the provider makes in the form of a cost report submitted at the end of its fiscal year. *Id.* § 1395g(a).

A provider is entitled to payment of the lesser of the "reasonable cost" or the "customary charge" of the services provided. *Id.* § 1395f(b).[2] Before 1972, the statutory provision that governed the determination of reimbursable "reasonable costs" stated simply that such costs were to be determined "in accordance with regulations establishing the method or methods to be used." 42 U.S.C. § 1395x(v)(1) (1970).[3] Pursuant to this authorization, the Secretary promulgated regulations providing that a particular provider's costs could be

disallowed to the extent they were "found to be substantially out of line with [those of] other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors."[4]

Under the pre–1972 scheme, the reimbursement process generally operated as follows. The provider would file a cost report with the fiscal intermediary, setting forth the costs of all services provided to Medicare patients during the year. If the provider's costs seemed high, the intermediary would construct, for purposes of comparison, a "peer group" comprised of similar facilities in the provider's geographic vicinity. If the provider's costs were "substantially out of line" with the costs of the peer group facilities, the intermediary would disallow the provider's excess costs. *See, e.g., Pleasantview Convalescent & Nursing Center, Inc. v. Weinberger,* 565 F.2d 99, 101 (7th Cir.1976). The provider could obtain review of the intermediary's determination by way of an appeal process

---

**2.** In 1983, Congress changed this aspect of the Medicare payment system by instituting the Prospective Payment System (PPS). *See generally Charter Medical Corp. v. Bowen,* 788 F.2d 728, 730–31 (11th Cir.1986). Under PPS, hospitals are reimbursed a fixed amount for each patient treated, regardless of the actual cost of treatment. This change is effective for cost years beginning after October 1, 1983 and is therefore not relevant here.

**3.** Before it was amended in 1972, section 1395x(v)(1) provided as follows:

(1) The reasonable cost of any services shall be determined in accordance with regulations establishing the method, or methods to be used and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable costs of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per

unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (A) take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (B) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

**4.** The Secretary derived the "substantially out of line" test from the legislative history of the 1965 Act, which explained that "[t]he provision in the bill for payment of the reasonable cost of services is intended to meet the actual costs," except "where a particular institution's costs are found to be substantially out of line with those of institutions similar in size, scope of services, utilization, and other relevant factors." S.Rep. No. 404, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 1976.

administered by the intermediary. At the administrative proceeding, the provider would have the burden of demonstrating that the costs disallowed by the intermediary were in fact reasonable. *See Overlook Nursing Home, Inc. v. United States*, 556 F.2d 500, 506 (Ct.Cl.1977). If the provider was dissatisfied with the administrative ruling, it could seek judicial review in the Court of Claims.[5] That court would examine the administrative decision "for compliance with the Constitution, statutory provisions, and regulations ... as well as for the taint of arbitrariness, capriciousness, or lack of support in substantial evidence." *Gosman v. United States*, 573 F.2d 31, 34 (Ct.Cl.1978).

In 1972, Congress amended several sections of the 1965 Act. Social Security Amendments of 1972, Pub.L. No. 92–603, 86 Stat. 1329. For purposes of this discussion, the 1972 amendments wrought two changes to the reimbursement scheme. The first change affected the process by which the intermediary determines the amount of reimbursement to which the provider is entitled. The second change affected the process by which the provider may appeal that determination.

With regard to the first change, Congress amended section 1395x(v)(1) so as to grant the Secretary authority to promulgate regulations "provid[ing] for the establishment of limits on ... costs ... to be recognized as reasonable."[6] Pursuant to this authority, the Secretary has directed the Health Care Financing Administration (HCFA), which administers the Medicare program, to "establish estimated cost limits for direct or indirect overall costs or for costs of specific items or services or groups

---

5. The courts were divided as to the availability of judicial review. *See Whitecliff, Inc. v. United States*, 536 F.2d 347, 349 (Ct.Cl.1976) (noting lack of consensus on whether courts could review the merits of reasonable cost determinations), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977). Our predecessor circuit held that judicial review was available only in the Court of Claims. *Dr. John T. MacDonald Found., Inc. v. Califano*, 571 F.2d 328 (5th Cir.) (en banc), *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978).

6. Following its amendment in 1972, section 1395x(v)(1) read as follows, the amending language reproduced in italics:

(1)(A) The reasonable cost of any services shall be *the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be* determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of ser-

vices on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of cost of particular items or services, *may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this title,* and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services *(excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this title)* in order that, under the methods of determining costs, the *necessary costs of efficiently delivering covered services* to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

of items or services." 42 C.F.R. § 413.30(a)(2) (1986). The HCFA, acting on this directive, has established prospective cost reimbursement limitations based on various classifications. Under the HCFA's cost limit system, a provider is classified according to its number of beds and whether it is located in a rural or urban area. Based on this classification, the provider is assigned a per diem cost limit. The per diem limit is then broken down into a labor component and a nonlabor component, and the labor component is adjusted according to the wage index corresponding to the provider's location. *See, e.g.*, 46 Fed.Reg. 33637 (June 30, 1981) (describing HCFA's methodology and providing base figures and indices for the cost periods beginning on or after July 1, 1981).

Under the new scheme, as under the prior scheme, the provider files a cost report with its intermediary at the end of its fiscal year and makes a claim for reimbursement. However, unlike under the pre–1972 scheme, the intermediary does not then apply the "substantially out of line" test to determine which of the provider's costs are to be allowed. Rather, after the intermediary has audited the provider's cost report, it simply disallows those costs in excess of the cost limits established by the HCFA.

Along with the regulations authorizing the HCFA to set cost limits, the Secretary has also promulgated regulations establishing a process by which a provider can, in certain defined circumstances, seek an adjustment of the limits as applied to its claim. For example, a provider classified as a rural hospital for the purposes of the cost limits may apply for reclassification as an urban hospital. 42 C.F.R. § 413.30(d) (1986). Additionally, a provider may obtain an exemption from the limits if it is the sole hospital in a community, a new provider, a risk-based health maintenance organization (HMO), or a rural hospital with fewer than fifty beds. *Id.* § 413.30(e). Finally, a number of exceptions for specific costs are available, including exceptions for "atypical costs," costs incurred under "extraordinary circumstances," and costs incurred in connection with medical education programs. *Id.* § 413.30(f).

The second effect of the 1972 amendments pertinent to our discussion was to change the process by which the provider may appeal the intermediary's reimbursement determination. If the provider is dissatisfied with the intermediary's determination and if the amount in controversy is $10,000 or more, the provider can request a hearing before an administrative review board called the Provider Reimbursement Review Board. 42 U.S.C. § 1395oo (1982 & Supp. II 1984). The Board has the power to affirm, modify, or reverse the intermediary's determination. *Id.* § 1395oo (d). Within sixty days after a final decision by the Board, the Secretary may, on his own motion or at the request of the provider, review the Board's decision. *Id.* § 1395oo (f)(1). A provider dissatisfied with a final decision by the Board or the Secretary can seek judicial review in federal district court. *Id.* The district court's review is conducted in accordance with the Administrative Procedure Act, and is made on the basis of the administrative record. *See* 5 U.S.C. § 706 (1982).

II.

Medical Center Hospital (MCH), a general acute-care hospital located in Punta Gorda, Florida, is a participant in the Medicare program. In September 1982, MCH submitted to its fiscal intermediary, Blue Cross/Blue Shield of Florida, a request to be reclassified for purposes of the HCFA's cost limits. At the time, MCH was classified as a rural hospital, and it sought to be reclassified as an urban hospital. The HCFA classified providers as either rural or urban based on whether they were located outside or inside a Standard Metropolitan Statistical Area (SMSA). Although MCH was not located within an SMSA, it contended that it was entitled to the higher cost limits applicable to urban hospitals because it competed for labor with two neighboring hospitals that did fall within SMSAs.

Blue Cross/Blue Shield forwarded MCH's request for reclassification to the

HCFA, which denied it on the ground that MCH was not located within an SMSA. MCH then filed a cost report with Blue Cross/Blue Shield for its fiscal year ending June 30, 1982. Blue Cross/Blue Shield processed MCH's reimbursement claim, applying the lower cost limits applicable to rural hospitals. Upon receiving its Notice of Program Reimbursement from Blue Cross/Blue Shield, MCH filed a request for a hearing before the Provider Reimbursement Board. The Board ruled that it was bound by applicable regulations, and left Blue Cross/Blue Shield's reimbursement determination undisturbed.

MCH then sought review in federal district court pursuant to 42 U.S.C. § 1395*oo* (f) (1982 & Supp. II 1984). After the parties joined issue, MCH filed a motion for summary judgment. In its supporting memorandum, MCH set forth two theories pursuant to which it claimed it was entitled, as a matter of law, to reconsideration of its reimbursement claim. First, it contended that the cost limit regulations and the cost limit schedules were arbitrary and capricious within the meaning of 5 U.S.C. § 706 (1982) because they were based on irrational classifications and stale data. Second, it contended that the cost limit schedules, as they were applied by the Secretary, violated 42 U.S.C. § 1395x(v)(1)(A)(ii) (1982), which states that the regulations governing the determination of reasonable costs shall "provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." MCH argued that even if the cost limits were not arbitrary and capricious, section 1395x(v)(1)(A)(ii) required the Secretary to make available and administer a process by which individual providers could prove, on a case-by-case basis, that their reimbursable costs exceeded the amount allowed under the HCFA's cost schedules.

The Secretary subsequently filed his own motion for summary judgment, arguing (1) that the cost limit regulations were neither arbitrary nor capricious as a matter of law, and (2) that Congress, in enacting the 1972 amendments authorizing the Secretary to set cost limits, intended that those limits be applied on a conclusive basis. The Secretary contended that the express purpose of the 1972 amendments was to eliminate case-by-case adjudications by the review board of providers' reimbursement claims, and that MCH's construction of section 1395x(v)(1)(A)(ii) would entirely defeat that purpose.

The district court held that the Secretary had acted within his statutory authority when he promulgated the cost limit regulations.[7] The court further held, however, that "application of the Secretary's cost limits and reasonable cost regulations in a manner that creates irrebut[t]able presumptions which foreclose a provider's opportunity to present evidence of reasonable costs actually incurred ... is inconsistent with 42 U.S.C. § 1395x(v)(1)(A)." Accordingly, the court remanded the case to the Secretary for review of MCH's claimed costs "to determine if they were reasonably incurred, as opposed to unnecessary, in the efficient delivery of needed health services, utilizing the standard criteria developed by the Secretary as well as other relevant evidence of reasonable costs presented by MCH." The Secretary now appeals.[8]

### III.

The issue before us is whether the Secretary has authority to apply the HCFA's cost limit schedules on a conclusive basis, or whether the Secretary must instead afford MCH the opportunity to demonstrate that its reimbursable "reasonable costs" exceeded the amount allowed under the applicable cost limit schedule. Before addressing that issue, we must clarify the scope of review applicable to this case.

---

**7.** MCH does not challenge this ruling in this appeal.

**8.** We have jurisdiction to hear this appeal. *See North Broward Hosp. Dist. v. Bowen,* 808 F.2d 1405, 1408 n. 3 (11th Cir.1987).

Review of the Secretary's decision is conducted under 42 U.S.C. § 1395oo (f)(1) (1982 & Supp. II 1984), which in turn incorporates the Administrative Procedure Act's standard of review. *See* 5 U.S.C. § 706 (1982). Under that standard of review, courts must accord considerable deference to an agency's interpretation of the meaning of a provision within the expertise of the agency. *See, e.g., Pacific Coast Medical Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir.1980); *see also Memorial Hosp. v. Heckler*, 706 F.2d 1130, 1135 (11th Cir. 1983), *cert. denied*, 465 U.S. 1023, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). This general rule does not mean, however, that a court should abdicate its judicial responsibility to review an agency's construction that is alleged to be inconsistent with the statutory mandate. As the Supreme Court has explained,

> an agency acting within its authority to make policy choices consistent with the congressional mandate should receive considerable deference from courts, provided, of course, that its actions conform to applicable procedural requirements and are not "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," 5 U.S.C. § 706(2)(A). *See, e.g., Batterton v. Francis*, 432 U.S. 416, 424–426, 97 S.Ct. 2399, 2404–2406, 53 L.Ed.2d 448 (1977); *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 137–138, 60 S.Ct. 437, 438–439, 84 L.Ed. 656 (1940). When an agency's decision is premised on its understanding of a specific congressional intent, however, it engages in the quintessential judicial function of deciding what a statute means. In that case, the agency's interpretation, particularly to the extent it rests on factual premises within its expertise, may be influential, but it cannot bind a court.

*Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 98 n. 8, 104 S.Ct. 439, 444 n. 8, 78 L.Ed.2d 195 (1983); *see also FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) (reviewing court "must reject administrative constructions of [a] statute, whether reached by adjudication or rulemaking, that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement"). The issue before us in this case is whether the Secretary has acted in violation of his statutory mandate, not whether the Secretary has made an unwise policy choice in implementing that mandate. In conducting our review, therefore, we need not accord a high level of deference to the Secretary's interpretation of the statute.[9]

We begin our analysis, as we must, by examining the language of section 1395x(v)(1)(A). That section provides that reimbursable reasonable costs "shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." The section continues that reimbursable costs "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs." Thus, section 1395x(v)(1)(A) clearly authorizes the Secretary to promulgate regulations establishing how reasonable costs are to be determined.

The section next sets forth a description of the possible content of those regulations:

> Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the effi-

---

9. Additionally, the Secretary's interpretation of section 1395x(v)(1)(A) in particular is entitled to limited deference because "the Medicare statute specifically circumscribes the Secretary's discretion to define reasonable costs." *Northwest Hosp., Inc. v. Hospital Serv. Corp.*, 687 F.2d 985, 991 (7th Cir.1982).

cient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs.

To this point, our reading of the statute supports the position the Secretary has taken in this litigation. The statute authorizes the Secretary to promulgate regulations establishing the methods to be used to determine reimbursable costs, and it also instructs the Secretary that those regulations "may provide for the establishment of limits on ... costs ... to be recognized as reasonable." We agree that the language reviewed thus far, taken in isolation, could reasonably be construed as authorizing the Secretary to establish cost limits and apply them on a conclusive basis.

The problem, however, comes in the final subsection. Subsection (v)(1)(A)(ii) expressly provides that the regulations establishing the methods to be used in determining reimbursable costs "shall ... provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be inadequate or excessive." MCH argues that this language requires the Secretary to grant an individual provider a corrective adjustment whenever the provider can establish that payment according to the method of determining reasonable costs—here, the HCFA's cost schedules—does not result in full reimbursement of that provider's reasonable costs.

In response, the Secretary contends that subsection (v)(1)(A)(ii) authorizes him to make "suitable retroactive corrective adjustments" only where the cost limit methodology has proven defective on a systemic basis. Thus, in the Secretary's view, subsection (v)(1)(A)(ii) would authorize him to act only if, for example, the HCFA's cost limit schedules in retrospect proved to be based on erroneous calculations and the error had resulted in either deficient or excessive payments across the board. The Secretary argues in the alternative that even if subsection (v)(1)(A)(ii) does require corrective adjustments on an individual provider basis, that requirement is satisfied by the so-called "exceptions process" established in 42 C.F.R. § 413.30 (1986).

We are unable to square either of these arguments with the language of the statute itself. The argument that subsection (v)(1)(A)(ii) requires corrective adjustments only for systemic defects is inconsistent with the statute's reference to "retroactive corrective adjustments ... for *a provider* of services." (Emphasis added.) We do not think that Congress would have referred to "a provider" in the singular form had it intended that retroactive adjustments be available only to correct systemic, across-the-board defects.[10]

The Secretary's alternative argument that his "exceptions process" satisfies the requirement of subsection (v)(1)(A)(ii) is likewise inconsistent with the language of the statute. As explained above, the exceptions process permits the HCFA, in certain narrowly defined circumstances, to grant individual providers (1) exemptions from the cost limits, (2) exceptions for certain specific costs, and (3) reclassifications for purposes of applying the limits. Subsection (v)(1)(A) provides, however, that reimbursable costs "shall be the cost *actually incurred*, excluding therefrom any part of incurred costs found to be unnecessary in the efficient delivery of needed health services." (Emphasis added.) We can imagine myriad situations where resort to the Secretary's exceptions process would not result in the provider receiving the full reimbursement to which it is entitled under the statute. In this very case, MCH in-

**10.** The Secretary cites cases, including *Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir.1977), in which courts have held that the "retroactive corrective adjustments" provision gives the Secretary power to correct certain systemic defects. *See also Mason Gen. Hosp. v. Secretary of HHS*, 809 F.2d 1220, 1226 (6th Cir.1987) (collecting cases). These cases have limited bearing on the present case, however, because they did not address the issue presented here: whether the "retroactive corrective adjustments" provision requires the Secretary to allow costs in excess of the HCFA cost limits where the provider is able to prove that those costs were reasonable.

curred certain labor costs for which it sought reimbursement at the level available to neighboring hospitals. Because none of the Secretary's exceptions applied to MCH's claim, however, MCH was denied full reimbursement of its claimed costs even though there had never been a finding, as required by subsection (v)(1)(A), that the costs denied were "unnecessary in the efficient delivery of needed health services."

Notwithstanding the inconsistencies between his position and the statutory language, the Secretary asserts that his position is supported by what he terms the "obvious" congressional intent behind the 1972 amendments. The Secretary argues that the 1972 amendments, because they authorized the Secretary to establish cost limits, were intended to foreclose providers from challenging the result achieved through application of those limits. The Secretary argues that not to give the limits conclusive effect would be to render the 1972 amendments a "nullity."

■ After having reviewed the legislative history of the 1972 amendments in its entirety, we are not convinced that Congress intended to foreclose providers from challenging the adequacy of the reimbursement resulting from application of the cost limits. Indeed, the legislative history suggests precisely the contrary: that the cost limits should be given presumptive weight only, and that individual providers should be afforded the opportunity to prove that costs in excess of the limits were reasonably incurred and therefore reimbursable. *See* H.R.Rep. No. 231, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 4989, 5070 ("[The cost limit methodology] would be exercised on a class and *presumptive* basis—relatively high costs *that cannot be justified by the provider as reasonable* for the results obtained would not be reimbursable....") (emphasis added); *see also* S.Rep. No. 1230, 92d Cong., 2d Sess., 189 (1972) (same).

This interpretation does not, as the Secretary suggests, render the 1972 amendments a "nullity." As the legislative history indicates, presumptive cost limits can

serve several useful purposes. Such limits, because they are issued at the beginning of the expenditure period to which they apply, supply a fiscal planning aid to providers: they give providers guidance as to the what level of expenditure the government will be willing to recognize as reasonable and therefore reimbursable. *See* H.R.Rep. No. 231, *supra*, at 5070 ("The proposed new authority to set limits on costs ... would be exercised on a prospective, rather than retrospective, basis so that the provider would know in advance the limits to Government recognition of incurred costs and have the opportunity to act to avoid having costs that are not reimbursable."); *id.* at 5069 ("The disallowance of costs ... after such costs have been incurred creates financial uncertainty for the providers...."). Moreover, the cost limit methodology enables intermediaries to disallow costs in the first instance without having to engage in a case-specific evaluation of reasonableness. Before the adoption of the cost limit methodology, an intermediary could disallow a provider's costs in the first instance only to the extent it could establish that the provider's costs were "substantially out of line" with comparable facilities in the provider's geographic vicinity.[11] Congress apparently came to regard this approach as inadequate, and determined that the cost limit methodology would provide a more effective means for evaluating reimbursement claims in the first instance. *See* H.R.Rep. No. 231, *supra*, at 5069–70 ("[P]resent law generally limits exercise of the authority to disallow costs to instances that can be specifically proved on a case-by-case basis. Clear demonstration of the specific reason that a cost is high is generally very difficult."). Congress' emphasis that the limits were to be applied on a *presumptive* basis, however, indicates that it intended that the provider retain the right to seek an adjustment of the intermediary's reimbursement determination on the basis that the costs disallowed were in fact reasonable and therefore reimbursable. Of course, as before, the provider would have the burden of establishing the reasonableness of the expenditures.

---

**11.** *See supra* note 4 and accompanying text.

This interpretation of the congressional intent behind the 1972 amendments is borne out by the structure and organization of the statute. The provision in the 1972 amendments authorizing the Secretary to establish cost limits was inserted in a preexisting sentence that set forth various possible methods by which the Secretary could determine reasonable costs.[12] The Secretary has not suggested that he has ever, either before or after enactment of the 1972 amendments, had authority to apply the other methods on a conclusive basis. Indeed, to the extent that other methods have been used, they have been applied on a presumptive basis.[13] Additionally, the "retroactive corrective adjustment" provision of the statute was in place before enactment of the 1972 amendments and was not altered by those amendments. We can therefore assume that this provision gives individual providers the same right to challenge their reimbursement determinations as it did before the enactment of the 1972 amendments.[14]

### IV.

In summary, we conclude that the HCFA's cost limits can be applied on a presumptive basis only.[15] Accordingly, we affirm the district court's order requiring the Secretary to (1) afford MCH an opportunity to prove that its claimed expenses were in fact reasonable, and (2) make such corrective adjustments as may be necessary.

AFFIRMED.

---

12. *See supra* note 6.

13. For example, in *Overlook Nursing Home, Inc. v. United States*, 556 F.2d 500 (Ct.Cl.1977), a case involving a provider's 1968–1970 cost years, the intermediary relied on national price surveys to disallow partially the provider's claim. Before the administrative review board, the provider sought, through the testimony of a pharmaceutical supplier, to establish that the disallowed costs were in fact reasonable. The review board upheld the intermediary's determination. On appeal, the Court of Claims affirmed the review board. In its opinion, the Court of Claims made clear that the method used by the intermediary to determine costs—the national price data—was not conclusive but only presumptive: "We stress that our holding does not establish that national price data will always be determinative of local market conditions. We conclude only that on this record, plaintiff did not sustain its burden of presenting evidence to support the reasonableness of its claim." *Id.* at 506.

14. The Secretary is apparently unwilling to concede that he has *ever* interpreted the "retroactive corrective adjustments" provision to require provider-specific adjustments. The Secretary cannot, however, dispute the observation that such adjustments were available prior to the institution of the cost limit methodology. It is not clear to us where, if not from the "retroactive corrective adjustments" provision, the Secretary derived the authority to make those adjustments. In any event, we hold that the plain language of the "retroactive corrective adjustments" provision requires the Secretary to make provider-specific adjustments where the provider can show that its disallowed costs were reasonably incurred.

15. The Ninth Circuit reached the same conclusion in *Regents of Univ. of Cal. v. Heckler,* 771 F.2d 1182 (9th Cir.1985). Citing *City of Austin v. Heckler,* 753 F.2d 1307 (5th Cir.1985), the Secretary asserts that the Fifth Circuit has also decided the issue and has reached a contrary conclusion. We disagree with the Secretary's reading of *City of Austin.* In that particular case, the court was presented with two issues: (1) whether the cost limits were arbitrary and capricious, and (2) whether the Secretary had wrongfully denied the provider's application under the Secretary's "exceptions process." Neither of those issues is relevant to the issue we decide today.