**SARASOTA MEMORIAL HOSPITAL,
et al., Plaintiffs,**

v.

**Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant.**

No. 92–1816–CIV–T–17A.

United States District Court,
M.D. Florida,
Tampa Division.

March 25, 1994.

Carel T. Hedlund, Ober, Kaler, Grimes & Shriver, Baltimore, MD, Dennis Rex Ferguson, Murnaghan, Ferguson & Maguire, P.A., Tampa, FL, for Sarasota Memorial Hosp., Venice Hosp., HCA Doctors Hosp. of Sarasota, Englewood Community Hosp.

Lana Smith Sensenig, Dept. of Health & Human Services, Regional Counsel's Office, Atlanta, GA, Gary John Takacs, U.S. Attorney's Office, Tampa, FL, for Louis W. Sullivan and Donna E. Shalala.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This case is before the Court on Plaintiffs' Motion for Summary Judgment, filed July 30, 1993 (Docket No. 10); the accompanying Memorandum in Support of Plaintiffs' Motion for Summary Judgment, filed July 30, 1993 (Docket No. 11); Defendant's Motion for Summary Judgment, filed September 22, 1993 (Docket No. 17); Memorandum in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, filed September 22, 1993 (Docket No. 18) and October 15, 1993 (Docket No. 22); and Plaintiffs' Memorandum in Opposition to Defendant's Cross Motion for Summary Judgment, filed October 18, 1993 (Docket No. 23).

This circuit holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–97 (5th Cir. 1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id.[, 477 U.S. at 322, 106 S.Ct. at 2552,] at 273.

The court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.,* [477 U.S. at p. 324, 106 S.Ct. at p. 2553,] at p. 274.

*FACTS*

The relevant facts of this case are lengthy and detailed. Since they are undisputed and essential to the decision, they are recited completely as follows:

1. Plaintiffs are located in the Sarasota metropolitan statistical area.

2. Prior to January 1, 1981, the Internal Revenue Code allowed employers to pay the employee's share of Social Security taxes (hereafter FICA), without including the employee FICA payment as additional employee income, for purposes of calculating the employer's payroll tax liability for FICA. This allowed the employer to exclude the FICA portion from the gross wages of the employee, and therefore the employer could base both portions of the FICA tax on employee income net of the employee FICA contribution. The result was a lower total cost without affecting the employee's net pay.

3. Beginning on October 1, 1979, Sarasota Memorial Hospital, et al., (hereafter Memorial) began paying employee FICA instead of deducting it from employee gross pay. This action was taken in lieu of granting employees a wage increase in 1979.

4. Effective January 1, 1981, Public Law 96–499 eliminated the Internal Revenue Code's exclusion of the employer-paid employee FICA from employee income, thereby removing the incentive for employer payment of employee FICA for all employers *except* state and local government entities covered by Social Security under 42 U.S.C. Section 409. These governmental employers were permitted to continue to pay the employee share of FICA and receive tax-savings through December 31, 1983. Memorial was one of these qualifying entities.

5. Between October 1, 1979, when Memorial started paying the employee share of FICA, and December 18, 1983, when it ceased this practice, Memorial reported the employer-paid employee FICA on its annual Medicare cost reports as an employee health and welfare cost.

6. In 1983, the Social Security Amendments created a prospective payment system for hospital operating costs for inpatient services provided to Medicare patients. This changed the method that hospitals received funds from the Medicare program from a hospital cost based reimbursement program to costs system in accordance to a pre-determined amount per discharge which varies according to the diagnosis related group (hereafter DRG). Under the Prospective Payment System (hereafter PPS), a four year transition period would ensue wherein the cost based rate would decrease and the DRG rate would increase over the term. As part of the process, the Secretary of Health and Human Services (hereafter Secretary) was required to develop a factor to reflect the relative wage levels for hospital workers in different regions of the country (hereafter wage index). For the periods at issue, the wage index was based on total wages paid by the hospitals during their fiscal year ending in 1982. This information was obtained from cost report data and supplemental information collected by Medicare fiscal intermediaries. The hourly wage reported by all hospitals subject to PPS in each metropolitan statistical area (hereafter MSA) was compared to the average hourly wage for the region in which the MSA was located, and to the national average hourly wage.

7. In 1983, the Secretary promulgated an interim final rule, with comment period, implementing the PPS system and explained in

the preamble how the agency would respond if either the Secretary or the Bureau of Labor Statistics made an error that resulted in an incorrect wage index for an area.

8. In January of 1984, as a result of comments made by hospitals, the Secretary responded, in a preamble to the final rule, stating that corrections to the wage index would be made prospectively only. She noted that "retroactive adjustment to the [PPS payment] rates would erode the basis of the prospective payment system that payment will be made at a predetermined, specified rate." She further noted that "Since a correction to the wage index could decrease as well as increase a hospital's prospective payment rate," the agency "should maintain the prospectivity of system when making any revisions to the payment rates."

9. In January 1984, Memorial discontinued the practice of paying employee FICA. To compensate for this shift, effective with the pay period beginning December 19, 1983, Memorial gave all employees a one-time wage increase equivalent to the employees' share of FICA, or 6.7%. The employees also received their usual year-end economic adjustments and merit increases.

10. In March, 1984, the Intermediary distributed wage surveys to be completed by all hospital providers for fiscal year 1982. This wage survey instructed the providers to report their wages from Worksheet A, line 84, column 1 of their 1982 fiscal year cost report. It also required them to report in a separate box their total gross employee health and welfare costs from Worksheet A, line 4, column 7.

11. On July 2, 1984, the Secretary, through her intermediaries, wrote to each hospital participating in the wage survey, asking them to verify the accuracy of their response.

12. On July 3, 1984, the Secretary published a statement acknowledging that there were problems with the survey data.

13. On July 19, 1984, Memorial notified the Secretary, by letter, of its exclusion of employer-paid employee FICA from the reported wages on the 1982 wage survey and inclusion of the same amount reported as employee health and welfare.

14. On March 6, 1985, Memorial provided the Secretary with a revised wage survey for fiscal year 1982 which adjusted for the employer-paid employee FICA by reclassifying the 6.7% employee FICA tax from its reported employee health and welfare expense to its reported gross salaries.

15. On April 29, 1985, the Secretary acknowledged receipt of Memorial's corrected wage survey.

16. On May 15, 1985, and again on June 4, 1985, the Secretary informed Memorial that it would take more time than expected to "get all the needed information".

17. On June 26, 1985, the Secretary informed Memorial that it was evaluating and reviewing the data and proposed corrections to the 1982 Wage Index and would give Memorial's proposed corrections "every consideration" in developing the final index.

18. On September 3, 1985, the Secretary published a revised 1982 Wage Index for Sarasota.

19. On May 6, 1986, the Secretary published a revised 1982 Wage Index for Sarasota, effective for discharges on or after May 1, 1986.

20. On July 10, 1986, Memorial again wrote the Secretary, providing a detailed analysis of the circumstances of the error.

21. On August 25, 1986, the Secretary stated that it would not revise the 1982 Wage Index for the stated reason that it considered employer-paid employee FICA to be fringe benefits, not wages. The Secretary wrote:

> We regret that we cannot accommodate the changes you wish to make to the hospital wage index data. The instructions for the wage survey were that gross wages and salaries were to reflect the figure on Worksheet A, line 84, column 1 of the Medicare cost report. In this connection, we note that section 2144.1 of the Medicare Provider Reimbursement Manual (HCFA Publication 15–1) states that "Fringe benefits are amounts paid to or on behalf of, an employee, in addition to direct salary or wages, and from which the employee ... derives a personal benefit."

The letter also stated that except where data errors are "clearly in evidence," HCFA believes that ad hoc corrections to the wage date would compromise uniformity.

22. On September 3, 1986, the Secretary published a revised 1982 Wage Index in the Federal Register which did not include Memorial's revised data.

23. On October 1, 1990, the Secretary's prospective only rule became codified in a regulation.

*Standard of Review*

■ The scope of review of the Secretary's actions is whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence when the record is viewed as a whole. 42 U.S.C. Section 1395*oo*(f)(1). The agency is afforded a great deal of deference in decision making within its area of expertise. *TNT Tariff Agents, Inc. v. I.C.C.*, 525 F.2d 1089, 1093 (2d Cir. 1975). The Supreme Court has determined that the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ..., the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizen to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). This deference is even more appropriate where it is in an area as complicated as Medicare reimbursement. Even so, this deference is not absolute. It is still important for the court to determine whether the agency's interpretation is "consistent with the language of the regulation and with the purpose which the regulation is intended to serve." *Cheshire Hospital v. New Hampshire—Vermont Hospital Service*, 689 F.2d 1112, 1117 (1st Cir.1982).

*Discussion*

■ Both Plaintiffs and Defendant agree that the Medicare Act requires the Secretary to establish a wage index which reflected the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level. 42 U.S.C. Section 1395ww(d)(3)(E). Plaintiffs' argue, quite persuasively, that by not including the FICA in the employees wages, the MSA's wage index is askew and therefore not comparable to the national average wage index. Plaintiffs have stated that almost all other government hospitals facing the same situation included FICA in the gross wages reported to the intermediaries. There is no evidence in this record to support this contention, however. The conclusions to be drawn by the facts of this case indicate the exact opposite. The Secretary has stated that most MSA's in the country included a governmental hospital. These hospitals were under the same direction as Memorial in the area of reporting wages the same as reported on the Medicare cost sheet. There is no evidence to prove this was not done. That being the case, it would be inequitable to allow one governmental hospital to report wages including FICA and not the others. Therefore, the Plaintiffs' argument on this matter is without merit.

It is clear from the facts of this case that Memorial followed the directions correctly when it reported its wage information on the intermediaries wage survey for 1982. (See fact # 10 above). The focus of this case appears to be the Secretary's classification of employer paid employee FICA as a fringe benefit. Under PRM Section 2144.1, a fringe benefit is defined as

> Amounts paid to, or on behalf of, an employee, in addition to direct salary or wages, and from which the employee, his dependent (as defined by IRS), or his beneficiary derives a personal benefit before or after the employee's retirement or death. In order to be allowable, such amounts must be properly classified on the Medicare cost report—that is, included in the costs of the cost center(s) in which the employee renders services to which the fringe benefit relates—and when applicable, have been reported to IRS for tax purposes.

Section 2144.2 states that a fringe benefit must inure primarily to the benefit of the employee, but it may also have some intrinsic benefit to the provider.

If the statute is construed literally, it is entirely reasonable that the Secretary would find that the FICA payments fit into this definition. FICA payments paid by the employer for the benefit of the employee are "in addition to direct wages". Further, by the very nature of FICA payments, the "employee ... derives a personal benefit before or after the employee's retirement or death." Additionally, such costs were classified as fringe benefits on the Medicare cost report and have been reported to the IRS for tax purposes. These payments were for the primary benefit of the employee in that the employee was to receive future retirement benefits from them. Further, the provider received a benefit in lower costs. Plaintiffs' argue that the *intent* of the employer was to benefit themselves, and therefore the benefits (such as lower income taxes for employees) received by the employee are irrelevant here. However, this argument is not persuasive. No where in the statutes does it mention or even refer to the intent of the employer in deciding what constitutes a fringe benefit. Therefore, the Secretary's construction of the definition of fringe benefits is not in error.

Plaintiffs desire an explanation by the Secretary for the difference in treatment of FICA when paid by an employer as compared to an employee. The distinction lies in the question. The definition of fringe benefits states that it is an amount paid by the employer. The FICA was paid by Memorial as opposed to being paid by the employee. Therefore, the Secretary was not incorrect in asserting a difference in this instance.

Plaintiffs go further to state that their submission of a wage survey for 1984 wage information contained FICA in its wage amount and made a note of the addition in plain view of the intermediaries. Plaintiffs use this information to attempt to compel this Court to believe that the Secretary acted arbitrarily and capriciously. However, this Court finds merit in the Defendant's contention that the inclusion was due to an oversight and was not later changed because of the "prospective only" rule of the Secretary and the relatively minor amount involved for the applicable two months of 1984. It is also entirely possible that the intermediaries were not aware of the distinction being made and the errors ensuing.

Plaintiffs next argue that the Secretary's policy of excluding employer-paid employee FICA from wages must comply with rulemaking requirements because, they assert, that this changed existing agency policy. This argument is without merit. The Secretary's decision was merely an interpretation of the standing definition of the term "fringe benefit". The fact that employer-paid employee FICA was not included as an example of a fringe benefit does not mean that an interpretation of it as such changed existing policy. The definition of what qualifies as a fringe benefit has been long standing, and the examples listed in statute are by no means all inclusive. The Secretary's interpretation did not change existing law or policy. Therefore, the rulemaking requirements are inapplicable here.

*Conclusion*

In reviewing the facts and law in this case, there is nothing that conclusively establishes that the Secretary's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or unsupported by substantial evidence when the record is viewed as a whole." Affording the Secretary the deference she deserves, her interpretation of employer-paid employee FICA was entirely within her discretion, and reasonable in accordance with the existing law. Accordingly, it is

**ORDERED** that Defendant's Motion for Summary Judgment (Docket No. 17) be **GRANTED;** Plaintiffs' Motion for Summary Judgment (Docket No. 10) be **DENIED,** and the Clerk of the Court be **DIRECTED** to enter Judgment for the Defendant.

**DONE and ORDERED.**